IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASARCO LLC,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>SHORE TERMINALS LLC, a Delaware corporation; KINDER MORGAN ENERGY PARTNERS LP, a Delaware limited partnership; CELANESE CHEMICAL COMPANY, a Delaware corporation; UNION PACIFIC RAILROAD COMPANY, a Utah corporation; and Does 1-50, inclusive,<br><br>　　　　Defendants.<br>_____ / | No. C 11-01384 WHA<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR JUDICIAL NOTICE** |

### INTRODUCTION

In this CERCLA contribution action, defendant CNA Holdings, LLC (erroneously named as Celanese Chemical Company, Inc.) moves for summary judgment. For the following reasons, defendant's motion is **GRANTED**.

### STATEMENT

This dispute involves approximately 66 acres of land known as "the Selby Site." The Selby Site consists of upland and former tideland in Contra Costa County, and is bordered by the San Pablo Bay to the north and by a Union Pacific Railroad line to the south.

The site was originally the location of the Selby Smelting and Lead Company, a silver and lead smelter, which was built in 1884 and began operations in 1886. In 1905, a predecessor of ASARCO gained control of operations at the site and continued operations through 1970. As a

result of ASARCO's lead and refining operations, slag — a partially vitreous waste product of smelting — was produced and deposited on both the land owned by ASARCO and in the tidelands leased by it from the California State Lands Commission.  Approximately 60 acres of land were "created" by the accretion of slag along the shoreline resulting in the current 66-acre site.  The Selby Smelting and Lead Company closed in 1970 after being named as the likely source of lead that caused livestock deaths in Solano County.

After the Selby Smelting and Lead Company ceased operations, Virginia Chemicals (now CNA Holdings, LLC) acquired a leasehold on a 1.33-acre portion of the site and installed and operated a sulfur dioxide facility, which operated from 1971 to 1975.  Virginia Chemicals' operations caused spills of acid and the escape of fugitive sulfuric dioxide gas.  Virginia Chemicals ceased its operations after having problems with contamination of the top six feet of soil with sulfuric acid.

Subsurface investigations of the Selby Site began in 1973.  Acid-contamination of the soil on the Selby Site was first discovered in April 1976, during a joint agency inspection of the 1.33-acre Virginia Chemicals area, as well as of the adjacent Southern Pacific Transportation Company railroad spur tracks.  In response, in August 1976, the Regional Water Quality Control Board issued a cleanup and abatement order to various parties, including ASARCO, Virginia Chemicals, and the Southern Pacific Transportation Company, requiring that the acid contamination be remediated by the removal and replacement of the top six feet of soil in the 1.33-acre Virginia Chemicals production area, and by the installation and monitoring of wells.  In April 1977, after finding that the directives of the Board Order had been complied with, the Regional Water Quality Control Board rescinded the cleanup and abatement order.

In 1977, Wickland Oil Company purchased ASARCO's portion of the Selby Site.  In early 1980, Wickland Oil began plans to construct a coal export terminal.  As part of Wickland Oil's construction efforts, it submitted its proposed plans to the United States Army Corps of Engineers and suggested that the slag on the Selby Site be used as fill material in the levees in the Sacramento River Delta.  The State Department of Health Services advised the Corps that the slag was hazardous waste that posed a threat to the public and the environment if not properly

2

1  managed. In 1981, Wickland Oil leased the tideland portion of the Selby Site from the California
2  State Lands Commission, and began construction of a bulk refined marine-fuel terminal.
3  Operations of the fuel terminal began in 1982.

4      Several investigations of the Selby Site were conducted after Wickland Oil purchased the
5  site from ASARCO, including an investigation by the California Department of Fish and Game,
6  which sampled and analyzed samples from the slag and found arsenic, barium, copper, lead,
7  antimony, and zinc concentrations that exceeded EPA water-quality standards. As the owner of
8  the Selby Site, Wickland Oil looked for other responsible parties to address the hazardous waste
9  problems on the site.

10      In 1983, Wickland Oil filed a lawsuit in the United States District Court for the Northern
11  District of California, alleging a CERCLA Section 107(a) environmental-response cost-recovery
12  claim against ASARCO and the California State Lands Commission. While the Virginia
13  Chemicals production area was referred to repeatedly by the parties during the lawsuit, Virginia
14  Chemicals was never brought into the suit as a party. During the lawsuit, in 1988, a remedial
15  investigation report was submitted by expert Levine Fricke, summarizing an investigation of
16  offshore sediment, onshore soil, and groundwater samples collected on the Selby Site. This
17  remedial investigation report revealed that onsite slag deposits contained elevated concentrations
18  of heavy metals, including lead, arsenic, cadmium and zinc. Acid residues were detected in the
19  soil where Virginia Chemicals had operated its production facility. Offshore sampling also
20  revealed elevated metal concentrations in offshore sediments.

21      In March 1989, a consent judgment was issued under which Wickland Oil, ASARCO, and
22  the California State Lands Commission agreed to a phased remediation of the Selby Site. Under
23  the 1989 Wickland Settlement, the parties undertook two broad categories of remediation costs.
24  The first category included, among other things, the implementation of four "Interim Remedial
25  Measures" (IRMs), with each party assuming one third of the cost responsibility. The four IRMs
26  included: (i) excavating and neutralizing approximately 100,000 cubic yards of acid-affected
27  soil; (ii) dredging and removing approximately 98,000 cubic yards of contaminated offshore
28  sediments; (iii) installing an asphalt cap and constructing a storm-water drainage system; and (iv)

1    closing an on-site oxidation pond that was used to treat sewage from nearby homes, schools, and
2    other facilities. The four IRMs were implemented during the early 1990s and completed in 2006.
3    The second broad category included "other remediation costs," which included future costs for
4    remediation measures deemed "necessary and appropriate," as well as costs associated with
5    reimbursement of a government agency for costs incurred by the agency in connection with site
6    remediation. These "other remediation costs" were apportioned between the parties, with
7    ASARCO to bear a 42 percent share.

8        In 1999, the public health dangers associated with the presence of petroleum byproducts
9    such as methyl tertiary-butyl ether (MTBE), a gasoline additive, were recognized. In response, in
10   March 1999, Executive Order D-5-99 was released in California, requiring the removal of the
11   additive MTBE from California gasoline. As part of California's efforts to address concerns
12   about groundwater contamination from industrial sites, in January 2000, the California
13   Department of Toxic Substances Control (DTSC) was designated as the administering agency for
14   the Selby Site. In this capacity, the DTSC was charged with four tasks: (i) overseeing the Selby
15   Site cleanup; (ii) determining the adequacy and extent of cleanup; (iii) issuing the necessary
16   authorizations and permits relating to the cleanup; and (iv) issuing a certificate of completion.
17   Investigations in 2003 revealed hydrocarbons and MTBE in groundwater throughout the Selby
18   Site. DTSC required ASARCO, C.S. Land and the California State Lands Commission to
19   conduct additional response activities at the Selby Site and to submit a feasibility study and
20   remedial action plan for DTSC to evaluate and select an appropriate final remedy to address any
21   remaining groundwater contamination issues.

22       In 2005, ASARCO filed a voluntary petition for relief under bankruptcy chapter 11. In
23   response, the California State Lands Commission, C. S. Land, Inc. (a subsidiary of
24   ConocoPhillips, which acquired the Selby Site from Wickland Oil in 2000), and DTSC asserted
25   claims for ASARCO's share of past and future Selby Site environmental response costs. DTSC
26   took the position that ASARCO was jointly and severally liable for all past and future
27   remediation costs under Section 107 of CERCLA, and the California State Lands Commission
28   and C. S. Land asserted that ASARCO was liable for a 42 percent portion of all estimated future

4

remediation costs under the 1989 Wickland Settlement. In 2008, ASARCO filed a motion for approval of a settlement with DTSC, C.S. Land, and the California State Lands Commission, whereby it would pay environmental regulators over $33 million to resolve its CERCLA liabilities at the Selby Site. In 2009, ASARCO's plan for reorganization became effective, and funds for the environmental settlement were distributed.

ASARCO commenced the present action in March 2011, seeking contribution under Section 113(f) of CERCLA from defendants as potentially responsible parties liable for their equitable share of overpayment by ASARCO of response costs associated with remediation of the Selby Site. In September 2011, ASARCO filed a first amended complaint that added Union Pacific Railroad Company as a defendant (Dkt. No. 60). By stipulation, ASARCO dismissed defendant Shore Terminals LLC in May 2012 (Dkt. No. 118). The complaint alleges that all remaining defendants are liable under CERCLA as entities that have owned or operated manufacturing, storage, and transporting facilities on or near the Selby Site that involved hazardous substances. Defendant CNA moves for summary judgment on ASARCO's contribution claim on the grounds that it is time barred. Defendant Union Pacific filed a statement of non-opposition (Dkt. No. 109). No other defendant has responded to or joined defendant CNA's motion. This order follows full briefing and oral argument.

**ANALYSIS**

1.  **CERCLA.**

In response to widespread concern over the improper disposal of hazardous wastes, Congress enacted CERCLA in 1980 to facilitate the prompt cleanup of hazardous waste sites. *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 894 (5th Cir. 1993); *Burlington Northern and Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009). CERCLA's primary purpose is remedial: its provisions enable the government (federal or state) to respond efficiently and promptly to toxic spills and to hold parties responsible for hazardous releases liable for the costs of the cleanup. Congress envisioned that under CERCLA, costs associated with hazardous waste site cleanup borne by the government would be recouped, and that those responsible for the contamination would be held responsible. *Burlington Northern*, 556 U.S. at 602.

5

In order to achieve these goals, CERCLA provides two different claims for relief by which a party may recover some or all of its costs incurred as a result of remediating the release of hazardous substances: a cost-recovery action under Section 107(a), and a contribution action under Section 113(f)(1). Section 107(a) permits a party that has incurred "necessary costs of response" to sue four different potentially responsible parties: (i) a current owner and operator of a facility where hazardous substances were released; (ii) a past owner or operator who owned or operated the facility at the time of disposal; (iii) a transporter of hazardous substances; or (iv) a person who arranged for disposal or treatment at any facility containing such substances. Similarly, Section 113(f)(1) permits "an action by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make." *United Technologies v. Browning-Ferris Industries, Inc.*, 33 F.3d 96, 99 (1st Cir. 1994) (quoting *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994)); *see also United States v. Colorado & Eastern R. Co.*, 50 F.3d 1530, 1536 (10th Cir. 1995). That is, Section 113(f)(1) allows a party who has incurred cleanup costs to seek contribution from any other person who is liable or potentially liable for the creation of a hazardous waste site. *See Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004).

One critical distinction between the two rights of action is the applicable statute of limitations. Depending on whether the hazardous substances were removed from the site or remediated, either a three-year or a six-year statute of limitations applies to Section 107 cost-recovery actions. Section 113 contribution claims, however, are governed only by a three-year statute of limitations. 42 U.S.C. 9613(g)(3)(A)-(B); *Catellus Dev. Corp. v. L.D. McFarland Co.*, Case No. 91-685, 1995 U.S. Dist. LEXIS 19563, at *11 (D. Or. Dec. 18, 1995).

Defendant argues that ASARCO's Section 113(f)(1) contribution claim is untimely because it was brought more than three years after entry of the 1989 Wickland Settlement. ASARCO argues that the three-year statute of limitations period does not apply to settlements between private parties, and that the statute did not begin to run until 2009, when the bankruptcy court entered and approved ASARCO's plan for reorganization and approved its environmental settlement with the DTSC. Alternatively, ASARCO argues that the 1989 Wickland Settlement

6

does not cover the same response costs as the 2009 DTSC Settlement and that its contribution claim for costs under the 2009 DTSC Settlement is therefore timely.

To resolve this dispute, there are two inquiries that must be answered: *first*, whether the three-year statute of limitations period applies to judicially approved settlements as between private parties and *second*, whether the 1989 Wickland Settlement covered the "same response costs or damages" as those sought by ASARCO in the instant suit for contribution. If the answer to both questions is in the affirmative, then defendant's motion must be granted.

### 2. CONTRIBUTION CLAIMS: STATUTE OF LIMITATIONS AND TRIGGERING EVENTS.

There are four "triggering events" contained in Section 113(g)(3) that activate the running of the three-year statute of limitations period for CERCLA contribution claims: (i) the entry of a judgment; (ii) a section 9622(g) de minimis settlement; (iii) a section 9622(h) cost recovery settlement; and/or (iv) a judicially approved settlement. ASARCO argues that none of the four triggering events have occurred, and thus, its contribution claim is not time barred by Section 113(g)(3).

The question is whether, with respect to the fourth triggering event, a judicially approved settlement must be with the federal or a state government, or whether the settlement may be between private parties. ASARCO contends that the application of Section 113(g)(3)'s limitations period is triggered *only* by a judicially approved settlement "with the United States or a State," and that because the 1989 Wickland Settlement involved only private parties, it did not activate the statute of limitations. Defendant argues that ASARCO's interpretation of Section 113(g)(3), which excludes all private party CERCLA settlements, violates the canons of statutory construction and is inconsistent with CERCLA's aim of facilitating the complete and speedy cleanup of hazardous sites. For the reasons set forth below, this order finds that the three-year statute of limitations period applies to *all* judicially approved settlements and not just those judicially approved settlements to which a government is a party.

### A. Settlement and Statute of Limitations Provisions Under Section 113 for Contribution Claims.

To effectuate the remedial purpose of CERCLA, settlements between and among potentially responsible parties (PRPs) involving sites of environmental contamination are a significant aspect of CERCLA's liability scheme.

Congress attempted to further its goal of achieving expeditious settlements of CERCLA actions by, among things, adding a safe harbor provision into CERCLA for those PRPs who settle with the government. Specifically, CERCLA provides that a "person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. 9613(f)(2). The purpose behind this section is to "promote timely, voluntary settlements with the EPA and the states, and effectuate cleanup of hazardous wastes." *Akzo Coatings*, 803 F. Supp. at 1383. To effectuate its purpose, Section 113(f)(2) "insulates a potentially liable party who has settled a CERCLA action with the United States from liability to a potentially responsible party who has not settled" so that the settling party is not at risk of paying twice. *Ibid.* In this way, courts have noted that Section 113(f)(2) acts as a stick to non-settling parties and as a carrot to induce settlement. *Ibid.*; *see also United States v. Pretty Prods. Inc.*, 780 F. Supp. 1488, 1494 (S.D. Ohio 1991); *United States v. Union Gas Co.*, 743 F. Supp. 1144, 1152 (E.D. Pa. 1990).

Interestingly, the settlement provisions contained in Section 113(f) do not speak of "judicially approved settlements" between private parties. The safe harbor provision, on its face, only applies to settlements with "the United States or a State." Based on this, ASARCO argues that the statute of limitations provisions contained in Section 113(g), which also refer to "judicially approved settlements," only apply to settlements with the United States or a State. While there appears to be a dearth of case law addressing this specific point, as set forth below, this order finds that this cannot be what Congress intended.

As a matter of statutory construction, "if the language of a statute is clear, we look no further than that language in determining the statute's meaning." *United States v. Lewis*, 67 F.3d 225, 228 (9th Cir. 1995). Looking first to the plain language of Section 113(g), there is nothing

8

that limits the fourth triggering event to judicially approved settlements "with the United States or a State." To so interpret the fourth triggering event would mean that contribution actions brought after judicially approved settlements with a government would be subject to a limitations period different from actions brought after judicially approved settlements between private parties. Such a result makes little sense. It would provide a private party — so long as it does not settle with the federal or a state government — with an infinite amount of time to bring a contribution action against another party irrespective of the finality of prior judicial settlements relating to the same hazardous site. If ASARCO's argument were to be accepted, the statute of limitations would be indefinite because a triggering event might never occur. This result would undermine the certainty that statutes of limitations are designed to further. *See Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 925 (5th Cir. 2000). The plain language of the statute does not limit the type of judicially approved settlement that activates the three-year limitations period, and this Court will not add such limiting language.

Additionally, as a matter of grammatical construction, it makes little sense to impose a requirement that the approved settlement triggering the statute of limitations is party-specific. The phrase "such costs or damages" in subparagraph (B) refers to the initial clause "no action for contribution for *any* response costs or damages may be commenced more than 3 years after . . . ." (emphasis added). Section 113(g)(3), when read as a whole, is a single sentence with two distinct and independent subsections separated by the word "or." Subsections A and B are prepositional clauses modifying the body of the sentence, describing distinct events three years after which a party is prohibited from pursuing an action for contribution "for *any* response costs or damages" that were part of the approved settlement. *See RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 557 (6th Cir. 2007); *see also Union Station Assocs. LLC v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1226, 1229 (W.D. Wash. 2002); *City & County of Denver v. Adolph Coors Co.*, 829 F. Supp. 340, 344 (D. Colo. 1993). The provisions merely speak of the response costs and damages that were part of the settlement, not whether the settlement involved a specific party.

Moreover, to deny the Section 113(g)(3) limitations period to defendant would be contrary to the remedial purpose of CERCLA. CERCLA has two primary purposes: (1) to achieve the

9

prompt cleanup of hazardous waste sites and (2) to impose the cost of the cleanup on those responsible for the contamination. *United States. v. Rohm & Haas Co.*, 721 F. Supp. 666 (D. N.J. 1989); *State of Colorado v. ASARCO*, 608 F. Supp. 1484, 1491 (D. Colo. 1985). Settlement is consistent with the purpose of CERCLA, and courts have an interest in promoting *all* types of settlement in order to promote complete and final resolution of CERCLA disputes. *Metropolitan Housing Dev. Corp v. Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir. 1980); *Allied Corp.*, 771 F. Supp. at 222. This interest is especially pronounced in complex litigation over matters such as CERCLA claims, where the environmental and public health concerns invested in the remediation of hazardous sites is of crucial importance. It is hard to imagine that the parties involved in a CERCLA action would be diligent in seeking a complete resolution if, even after settlement, they could continue to seek contribution claims from other defendants *ad infinitum*. The measure of finality that a designated limitations period provides encourages speedy and diligent settlement processes, and these results are desirable with respect to settlements of all types, not just those involving the government. Thus, interpreting the three-year statute of limitations period to apply to all judicially approved settlements advances CERCLA's remedial aims by encouraging early and complete settlements among PRPs. *Exxon Corp.*, 697 F. Supp. at 685. The fact that the 1989 Wickland Settlement was only between private parties is of no significance for purposes of applying the three-year statute of limitations period in Section 113(g)(3).

ASARCO next argues that its contribution claim against defendant did not accrue until the 2009 DTSC Settlement. ASARCO gives short shrift to this argument. As the Supreme Court clearly held in *Cooper Industries*, a private party who has not been sued under Section 106 or Section 107 may not obtain contribution under section 113(f)(1) from other liable parties. 543 U.S. at 160-61. In other words, a private party can *only* bring a contribution claim if it has been sued under Section 106 or 107, or has settled its liabilities under Section 113(f)(3)(b). *Ibid*; *see also United States v. Atl. Research Corp.*, 551 U.S. 128, 138 (2007) ("[Section 113] authorizes a PRP to seek contribution 'during or following' a suit under § 106 or § 107(a).") Section 113(f) says nothing about whether the suit has to be brought by the federal or a state government, and in fact, the Supreme Court has held that private parties are entitled to bring suit under Section 107(a)

10

1    to recover costs from another responsible party. *Atl. Research Corp.*, 551 U.S. at 139 ("[Section]
2    107(a) permits cost recovery (as distinct from contribution) by a private party that has itself
3    incurred cleanup costs."). Given that Wickland Oil brought suit against ASARCO under Section
4    107 in 1983, ASARCO's contribution claim has accrued. The only question, then, is whether it is
5    now time-barred.

6    ASARCO's contribution claim accrued once Wickland Oil brought suit against it under
7    Section 107, and the statute of limitations began to run once the court approved the 1989
8    Wickland Settlement. As noted above, the next question is whether the 1989 Wickland
9    Settlement covers the same response costs now sought by ASARCO in its complaint against
10   defendant.

**B.    Scope of the 1989 Wickland Settlement.**

ASARCO makes much of the fact that the 1989 Wickland Settlement, even if a "judicially approved settlement" within the meaning of Section 113(g)(3), merely established a procedure for allocating past and future costs, and was not therefore an agreement to finance or perform "final" remedial tasks (Pl. Br. at 5-6, 10). To that end, ASARCO asserts that the remedial measures set forth in the 1989 Wickland Settlement were only "interim" measures, and that the only costs or damages that would be time-barred are those specifically addressed in the settlement agreement. Put differently, ASARCO argues that the 2009 DTSC Settlement covers "new and future costs" based on "new information" not contemplated by the 1989 Wickland Settlement, and that its contribution claim for these new costs is therefore not time-barred. Having reviewed the terms of the 1989 Wickland Settlement, as well as the incorporated Remedial Action Plan, this Court agrees with defendant that the allocation of past and future response costs, including those sought by ASARCO in the present dispute (which were sought by the DTSC in its proof of claim), were covered by the 1989 Wickland Settlement.

The analysis adopted by federal courts to determine whether a contribution action is barred by a prior consent decree or settlement is to consider whether the subject matter of the settlement and the contribution action are the same. *United States v. Witco Corp.*, 865 F. Supp. 245, 248 (E.D. Pa. 1994). Indeed, this is the test utilized by federal courts to determine the

11

applicability of the contribution bar contained in Section 113(f), and it provides useful guidance to determine whether, as here, a settlement covers the same response costs as those sought in a subsequent lawsuit seeking contribution. As noted above, CERCLA's contribution bar, contained in Section 113(f)(2), immunizes PRPs from subsequent liability if they settle with the government, but only for those matters addressed in the settlement. The test for determining the extent of "covered matters" is fact-intensive. "In determining whether a claim is made regarding matters not addressed in the settlement, a court must consider various factors, including the particular hazardous substance at issue in the settlement, the location or site in question, the time frame covered by the settlement, and the cost of the cleanup." *United States v. Pretty Products, Inc.*, 780 F. Supp. 1488, 1494-95 n.4 (S.D. Ohio 1991); *see also United States v. Union Gas Co.*, 743 F. Supp. 1144 (E.D. Pa. 1990).

Contrary to ASARCO's contention, the 1989 Wickland Settlement's terms were sweeping. *Cf. Ekotek Site Prp Comm. v. Self*, 881 F. Supp. 1516, 1523-24 (D. Utah 1995); *United States v. Scott's Liquid Gold*, 934 F. Supp. 362 (D. Colo. 1996). The Settlement specifically addressed allocation among the parties for two broad categories of costs, and together, these categories cover past and future response costs, including those related to the DTSC's proof of claim, which ASARCO categorizes as relating to groundwater contamination. ASARCO is correct that the 1989 Wickland Settlement and the incorporated Remedial Action Plan contemplated a "procedure" for allocating past and future costs, and that the Settlement also identified a number of interim measures. But these facts are not sufficient to create a material issue of disputed fact regarding the scope of the 1989 Wickland Settlement, which was in all other manners a comprehensive settlement that contemplated future and final remedial costs, including costs associated with "[a]cid-affected soils in the Virginia Chemicals area" for which defendant would potentially be liable. For example, in the 1989 Wickland Settlement, "Site Remediation" was defined to include "actions undertaken *or to be undertaken* to monitor, investigate, and/or abate *actual or threatened* environmental contamination caused *by or related to* the [Selby] Site addressed by the Remedial Action Plan" (emphasis added). The Settlement defined "Remedial Action Plan" to incorporate the report prepared by Levine Fricke, as well as

1  subsequent modifications to the Remedial Action Plan if "ordered by a Government Agency" or
2  deemed to be "necessary and appropriate" by the parties. The incorporated Remedial Action Plan
3  repeatedly mentioned measures to remediate the "potential for migration of acidic ground water"
4  as a result of the production facility operated by Virginia Chemicals, including "future
5  monitoring" of the area by way of water-quality sampling and acid neutralization efforts. The
6  Settlement went on to define "Other Remediation Costs" to include "*all* costs . . . incurred at any
7  time by or on behalf of the Parties, which are necessary and appropriate to implement Site
8  Remediation, *including costs*
9  . . . in reimbursement of a Government Agency . . ." (emphasis added). These provisions
10 unquestionably demonstrated that the 1989 Wickland Settlement covered all response costs —
11 past and future — associated with the Selby Site remediation, including costs resulting from
12 intervention by a state agency, such as DTSC. Indeed, continued investigation of the Selby Site,
13 including the preparation of additional action plans to address "final" remedial measures, were
14 contemplated by the Settlement and fall within Phase I Costs as they relate to the
15 "implementation of necessary and appropriate investigation or monitoring required by a
16 Governmental Agency in order to determine whether and to what extent Site Remediation in
17 addition to the [incorporated] Remedial Action Plan is necessary."
18      While it may not have been known at the time the 1989 Wickland Settlement was entered
19 into exactly how much the entire remediation efforts would cost, the Settlement's provisions
20 demonstrate that the settling parties agreed to share responsibility for future remediation costs —
21 such as those associated with acid-impacted soils, leaching of metals from the slag, and
22 groundwater contamination. ASARCO's argument that the costs it seeks from defendant in the
23 present dispute are not covered by the 1989 Wickland Agreement is not supported by the record,
24 and defendant's motion must therefore be **GRANTED**.
25                          *       *       *
26      Hazardous site investigation and remediation is expensive and lengthy. It would be
27 difficult to find a hazardous site where the process for investigation and remediation is static.
28 Many factors can change the complexion of the site, including new data, incorrect assumptions,

13

1  or discovery of an additional source of contamination.  In this way, it is not uncommon for site
2  investigations to proceed in phases, as occurred in this dispute, where investigations of the Selby
3  Site were conducted over a number of years and by a variety of different agencies.  Settlements
4  between PRPs may not always cover all contamination sources or costs, and to the extent that a
5  settlement does not cover a cost, a subsequent lawsuit seeking contribution may be appropriate.
6  This is not such an instance.

That ASARCO may be blameless, as it contends, for the contamination and resulting response costs associated with the Virginia Chemicals area is irrelevant for purposes of this dispute.  The right to seek contribution under Section 113(f) operates to ease the potential burdens that joint and several liability may create, but the action must nonetheless be timely.  ASARCO entered into a judicially approved settlement in 1989, agreeing to incur costs related to mending the tainted land at issue, which was comprehensive in its scope, and which covers the response costs that it now seeks in the present action.  Defendant CNA may ultimately be partially responsible for the unfortunate status of Selby Site, but it has nonetheless shown on this record that there are no material issues of disputed fact regarding the running of the applicable statute of limitations on ASARCO's contribution claim.  Defendant's motion is therefore **GRANTED**.

### 3. REQUEST FOR JUDICIAL NOTICE.

Pursuant to Federal Rule of Evidence 201, defendant requests judicial notice of various documents containing court filings and other matters of public record.  The request for judicial notice is **GRANTED**.

### CONCLUSION

ASARCO's contribution action is time-barred.  The claim seeking contribution was not commenced within three years of the entry of the 1989 Wickland Settlement on March 13, 1989; therefore, ASARCO's complaint is dismissed against defendant CNA Holdings LLC.  Judgment will enter for defendant.

**IT IS SO ORDERED.**

Dated: June 6, 2012.

William Alsup
UNITED STATES DISTRICT JUDGE

14